OXFORD OIL CO. et al. v. ATLANTIC OIL & PRODUCING CO. et al.

(District Court, N. D. Texas, Dallas Division. December 27, 1926.)

No. 3695.

1. **Constitutional law ⊝⟹123—State regulations governing production of oil from lands conveyed by the state held not to impair obligation of contracts (Const. art. 1, § 10).**

That a state patented to individuals lands, including all minerals therein, does not impair the right of the state to exercise its police powers over the same and reasonable regulations governing the production of such minerals as oil are not in violation of Const. art. 1, § 10, prohibiting impairment of the obligation of contracts.

2. **Constitutional law ⊝⟹113—Obligation of a contract is duty of performance coupled with the right and means of enforcement.**

The obligation of a contract is the duty of performance. It is the binding force, coupled with the means and right of enforcement.

3. **Constitutional law ⊝⟹278(1)—State regulation, governing drilling of oil wills to prevent injury to adjoining property, held not unconstitutional (Const. Amend. 14).**

A state regulation, governing the drilling of oil wells, designed to prevent injury to owners of adjoining land, does not deprive an owner of his property without compensation in violation of Const. Amend. 14.

4. **Mines and minerals ⊝⟹92—Texas statute, conferring power on Railroad Commission to regulate drilling of oil wells, held constitutional (Const. Tex. 1876, art. 10, § 2, as amended in 1890; Laws Tex. 1919, c. 155).**

The State Railroad Commission of Texas, created by legislative act under authority given by Const. Tex. 1876, art. 10, § 2, as amended in 1890, to pass laws to correct abuses and prevent discrimination in railroad rates, and to provide "the requisite means and agencies invested with such powers as may be deemed adequate and advisable," is not a constitutional but a legislative body, and the subsequent Act of March 31, 1919 (Laws Tex. 1919, c. 155), authorizing the commission to establish rules and regulations for the drilling of oil and gas wells, was within the legislative powers, and reasonable regulations adopted by the commission are constitutional and valid.

5. **Constitutional law ⊝⟹81—Police power extends to regulation of exercise of rights by one individual which may conflict with exercise of similar rights by others.**

The police power of a state is not limited to legislation for the safety and liberty and health of the citizen, but extends to cases where the exercise of rights by one individual may conflict with the exercise of similar rights by others.

6. **Mines and minerals ⊝⟹92—Regulation prohibiting drilling of oil wells nearer than 150 feet to property line without special authority held reasonable and valid.**

A regulation by the Railroad Commission of Texas, prohibiting the drilling of any oil or gas well nearer than 150 feet to any property line except by special authority, held reasonable and valid.

Action by the Oxford Oil Company and others against the Atlantic Oil & Producing Company and others. On general demurrer by defendants. Demurrer sustained.

C. L. Bass, of Fort Worth, Tex., R. H. Ward, of Houston, Tex., and Davis, Jester & Tarver, of Corsicana, Tex., for plaintiffs.

John L. Young and S. W. Marshall, both of Dallas, Tex., for defendant Oil Co.

Dan Moody, Atty. Gen., and Ernest May, of Austin, Tex., for members and employees of State Railway Commission.

ATWELL, District Judge. On the 14th of July, 1923, the plaintiffs were the owners of the oil, gas, and other minerals in place on, in, and under 3⅓ acres of land, approximately 56 feet in width at one end, and approximately 36 feet in width at the other end, and 3,190 feet in length, situated in Navarro county, Tex. The land was owned by the state of Texas on the 2d day of October, 1869, at which time it patented the same to John Taylor, from whose assigns the plaintiffs deraigned title. Thereafter the Constitutions of Texas, adopted in 1869 and 1876, relinquished to the grantees and patentees of all lands granted and patented by the state all the minerals in such lands.

Section 2 of article 10 of the 1876 Constitution of the state of Texas provides:

"The Legislature shall pass laws to correct abuses and prevent unjust discriminations and extortion in the rates of freight and passenger tariffs on the different railroads in this state; and shall, from time to time, pass laws establishing reasonable maximum rates and charges for the transportation of passengers and freight on said railroads, and enforce all such laws by adequate penalties."

On December 19, 1890, the said provision was amended to read:

"Railroads heretofore constructed. or

which may hereafter be constructed, in this state are hereby declared public highways, and railroad companies common carriers. The Legislature shall pass laws to regulate railroad freight and passenger tariffs, to correct abuses, and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads in this state, and enforce the same by adequate penalties; and, to the further accomplishment of these objects and purposes, may provide and establish all requisite means and agencies invested with such powers as may be deemed adequate and advisable."

A later constitutional amendment, in 1894, to section 30 of article 16, fixed the tenure of state officers, including that of three railroad commissioners.

On March 31, 1919, the Legislature passed an act (Laws Tex. 1919, c. 155) to conserve the oil and gas resources of the state and to define waste in the production of such minerals, and invested the Railroad Commission with authority to make and enforce the needful rules and regulations.

Article 2 of the act provided for the conservation in the original stratum of oil and gas when discovered, and for the protection of the same from infiltrating waters. Article 3 made it the duty of the Railroad Commission to make and enforce rules and regulations for such a conservation, and gave the commission ample authority in that direction; among other provisions was this language:

"It is empowered to establish rules and regulations for the drilling of wells and preserving a record thereof, and it shall be its duty to require such wells to be drilled in such manner as to prevent injury to the adjoining property, and to prevent oil and gas and water from escaping from the stratas in which they are found into other stratas, and to establish rules and regulations therefor."

Articles 4, 5, and 7 of the acts provided for the appointment of supervisors and their salaries; connection with pipe lines and other regulatory provisions, together with the establishment of a penalty of not more than $5,-000 a day against the violator of such rules, to be recovered in any court of competent jurisdiction.

Acting under these statutes, the Railroad Commission, on and prior to May 1, 1920, had promulgated 40 rules and regulations. No. 37 is as follows:

"No well for oil or gas shall hereafter be drilled nearer than three hundred (300) feet to any other completed or drilling well on the same or adjoining tract or farm, and no well shall be drilled nearer than one hundred fifty (150) feet to any property line; provided that the commission, in order to prevent waste or to protect vested rights, will grant exceptions permitting drilling within shorter distances than as above prescribed, upon application filed fully stating the facts, notice thereof having first been given to all adjacent lessees affected thereby. Rule 37 shall not for the present be enforced within the proven fields of the Gulf Coast."

Rules 28, 29, 33, 35, and 31 tightened the provision by making its observance the duty of pipe lines, contractors, and drillers, and in requiring certain certificates by those who would carry oil or handle the same, or be connected therewith.

The defendant Atlantic Oil Producing Company owned the land immediately west of and adjoining the plaintiff's strip. The Humble Oil & Refining Company and other oil companies owned the land adjacent to the plaintiff's holdings and on the east. The northern 900 feet of the plaintiff's strip contained more oil than that part extending further south.

In the summer of 1923 the owners, upon the east and west, began to drill their lands. The petition is silent as to the distance of such wells from the plaintiff's strip. I assume that such wells were no closer than rule 37, above quoted, allowed. Thereupon the plaintiffs began to make preparation to offset. The defendant Atlantic Company protested, and the commission, after investigation and hearing, to and in which the plaintiffs participated, denied the plaintiffs the right to drill ten wells in their strip in the proven territory mentioned, but allowed them to drill four wells—the first at a distance of 150 feet south of the north boundary, the second 1,063 feet, the third 1,220 feet, and the fourth 2,126 feet therefrom—and, upon plaintiff's continued preparation to drill a greater number, secured an injunction preventing the plaintiff from doing so, from which injunction the plaintiffs appealed, and which appeal has not yet been finally determined. After the appeal, other preparations were made by the plaintiffs, and they were attached in contempt.

In all of these proceedings before the commission and before the court, the defendant Atlantic Company was active. Defendants C. E. Gilmore, W. A. Nabors, and Walter Splawn composed the Railroad Commission. R. B. Wathall and C. O. Rison were employees thereof. But see Bohri v. Barnett (C. C. A.) 144 F. 389, as to liability of officers who act under law believed valid.

This court has jurisdiction to rule the controversy, not because of the diversity of citi-

zenship of the parties, but because of the constitutional questions raised.

Plaintiffs claim that rule 37, promulgated by the commission, is void. They claim that the vesting of the authority in the commission by the Legislature to supervise the drilling of oil wells in Texas is and was illegal; that such illegal acts and regulations was a violation of two of the provisions of the national Constitution, namely, section 10 of article 1, and the Fourteenth Amendment.

[1] Even though plaintiffs' land was originally patented to plaintiffs' assignees by the state, and all minerals therein conveyed to such assignees, the state was not thereby denied its usual and reasonable police power thereover. To sustain the contention of the plaintiffs under the provision of the Constitution (article 1, § 10), which provides that "no state shall * * * pass any * * * law impairing the obligation of contracts," would be to close the gates upon the right of the state to prohibit practically any use of private property that might be injurious to the individual or to society. The individual's right to use his property is limited to such uses as do not deprive some other citizen of an equally free use of his property. Individual rights may not be so magnified as to trample out of existence, or into deformity the individual rights of the neighbor. The state does not impair the obligation of its contract when it puts into operation a government utility to restrain and prevent one of its citizens from using land that it had patented to such citizen in such a way as would injure another citizen. "Sic utere tuo ut non alienum laedas."

[2] Again "the obligation of a contract is the duty of performance. It is the binding force, coupled with the means and right of enforcement or power to compel performance." A regulation such as is complained of may not be said to lessen the validity of the patent that the state originally issued to the assigns under whom the plaintiffs claim. Hays v. Port of Seattle (D. C.) 226 F. 287; Brown v. Colorado, 106 U. S. 95, 1 S. Ct. 175, 27 L. Ed. 132; Lord v. Thomas, 64 N. Y. 107.

[3] Closely akin to the answer made to plaintiffs' contention under the foregoing constitutional provision is, and must be, the answer to their contention raised under the Fourteenth Amendment, in so far as is concerned the validity of a state provision against the improper use of one's property.

[4] If, however, the Railroad Commission was a constitutional office, created for the purpose of "regulating railroad freight and passenger tariffs," then the Legislature would

have no power to place added duties on the shoulders of the commissioners entirely inconsistent with and out of the atmosphere of railroad territory. And, if the commission was illegally given the power to administer the oil industry of Texas, then the plaintiff's contention, under the Fourteenth Amendment, would be good, and this demurrer should be overruled.

All parties conceded at argument that, if the court should find that rule 37 was valid, plaintiffs would have no cause of action. If the court found rule 37 to be invalid, there would be a cause of action stated.

It has already been noticed, in the recital of the constitutional history surrounding the Texas Railroad Commission, that the 1890 amendment merely declared that the Legislature "may provide requisite means and agencies."

The court knows that, at the time of the campaign for the adoption of the 1890 constitutional amendment, there was little or no information concerning oil within the limits of the state. Likewise the court well remembers that the entire state recognized that the adoption of the amendment meant the passing of a statute which would authorize the appointment of a commission. It may be indulging in a fineness of reasoning to hold that the Constitution did not, in fact, create the commission. There is a difference, however, between constitutional provision and the general right of the law-making body, within itself, to speak into existence legislation that it may consider necessary.

In City of Denison v. Municipal Gas Company, 257 S. W. 616, the Court of Civil Appeals for the Fifth circuit of Texas, in passing upon the identical provisions of the Constitution that are now being examined, and in holding that the vesting in the Railroad Commission of the power to regulate and control Texas gas utilities, was proper and constitutional, said:

"A reading of the excerpt from the Constitution first above copied does not reveal the creation of a Railroad Commission thereby, nor the specific purpose that such commission shall be created. No careful, analytical consideration of it can impart that effect. The mandate is laid upon the Legislature in this provision to regulate tariffs, correct abuses, and prevent discriminations and extortion. The explicit permission to establish means agencies with such powers as the legislative discretion may dictate to accomplish the required objects, is embodied in the last clause of the section. This, however, is neither a grant of power and authority nor a definite

command to exercise power and authority. At most, it is, in our view, a mere recognition of the police power which already inherently rested in the Legislature; no constitutional restriction thereon ever having been imposed."

Upon motion for rehearing, Mr. Justice Looney, for many years Attorney General of Texas, in an opinion overruling the motion, commented upon the fact that the Texas Legislature had exercised such power unchallenged for many years, and had added additional duties to another executive officer in another branch of the state government, which had never been questioned, and who was created in a similar way.

If it is true that an oil well will drain the lands around it for 150 feet in each direction, and I think one may announce that to be the learning of Texas oil men, the plaintiffs could not drill their strip of land which was, at its widest, only 57 feet, without draining the contiguous lands. If allowed to drill unsupervised, they would not only get all of the oil that was under their own land, but, they would secure a large amount of property that belonged to others. They could not drill any well without this result. Under the first part of rule 37 they would not be permitted to drill at all, since no well they could drill would be 150 feet from the border line of the property belonging to some one else. But under that rule there was an exception, and within that exception, in order that the plaintiffs might not be in any sense deprived of their property, the commission allowed them to drill four wells. This regulation is not attacked as unreasonable. It is merely attacked as unconstitutional; that is, that the rule was not promulgated by any one who had the legal authority to do so. It is also questioned on the ground that it is not within the power of the state to so supervise the property of the individual, if the individual deraigned title through the state.

Statutes somewhat similar, to say the least, have been passed and sustained in other states. The Kansas Legislature made it unlawful to drill or operate oil or gas wells within 100 feet of the right of way of any steam or electric line of railway. In Winkler v. Anderson, 104 Kan. 1, 177 P. 521, 3 A. L. R. 268, the complainant owned a strip 50½ feet wide at one end and 37½ feet wide at the other. This strip was within the inhibited distance of a common carrier, and the court sustained the legislation. It was sustained on the ground that it was dangerous to the property and persons of the general public, and hence within the police power of the state.

In Ohio Oil Company v. Indiana, 177 U. S. 190, 20 S. Ct. 576, 44 L. Ed. 729, an act of the state of Indiana (Acts 1893, c. 136, § 1) providing "that it shall be unlawful for any person, firm or corporation having possession or control of any natural gas or oil well, whether as a contractor, owner, lessee, agent or manager, to allow or permit the flow of gas or oil from any such well to escape into the open air, without being confined within such well or proper pipes, or other safe receptacle for a longer period than two days next after gas or oil shall have been struck in such well and thereafter all such gas or oil shall be safely and securely confined in such well, pipes or other safe and proper receptacles," was held valid and not in violation of the Constitution of the United States. Mr. Chief Justice White, in writing for the court, recognized that oil and gas were affinities; that they were in rivers or pools or reservoirs; that the drilling of a hole down into or near such containers would give the gas an opportunity to come out of the hole and probably bring oil with it, and thus drain a large area that was not really in the land of the driller. He said:

"In view of the fact that regulations of natural deposits of oil and gas and the right of the owner to take them as an incident of title in fee to the surface of the earth, as said by the Supreme Court of Indiana, is ultimately but a regulation of real property, and they must hence be treated as relating to the preservation and protection of rights of an essentially local character. Considering this fact and the peculiar situation of the substances, as well as the character of the rights of the surface owners, I cannot say that the statute amounts to a taking of private property, when it is but a regulation by the state of Indiana of a subject which especially comes within its lawful authority."

Under the Texas decisions, the landowner owns the oil and gas in place (Texas Company v. Daugherty, 107 Tex. 226, 176 S. W. 717, L. R. A. 1917F, 989), while in Indiana he has only the right to drill for and reduce the oil to possession. I do not believe that the difference is important, but, if it has any bearing upon the problem we are discussing, it tends to add a stiffening to the reason for sustaining the Texas regulation as a proper exercise of its police power.

[5] We must not limit police power to such legislation as will serve to operate upon the safety and liberty and health of the citizen. The variety of cases in which the exercise by one individual of his rights may conflict with a similar exercise by others, is multitudinous,

and the courts have not found it impossible to uphold police legislation that prevents such trespass. Bacon v. Walker, 204 U. S. 317, 27 S. Ct. 289, 51 L. Ed. 499; Commonwealth v. Alger, 7 Cush. (Mass.) 53; Barbier v. Connolly, 113 U. S. 31, 5 S. Ct. 357, 28 L. Ed. 923; Manigault v. Springs, 199 U. S. 478, 26 S. Ct. 127, 50 L. Ed. 274; Holden v. Hardy, 169 U. S. 366, 18 S. Ct. 383, 42 L. Ed. 780; Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 31 S. Ct. 337, 55 L. Ed. 369, Ann. Cas. 1912C, 160; and many cases cited at page 1278, 12 Corpus Juris, of a likeness.

In the very recent case of Village of Euclid v. Ambler Realty Company, 47 S. Ct. 114, 71 L. Ed. ——, not yet [officially] reported the Supreme Court of the United States calls our attention to the constant change of conditions, the discovery of the new, the coming of the multitude, and the continuing bigness of the law through its splendid elasticity, though it is itself unchangeable, to cope with all, and to continue to so restrain as to constantly liberate.

[6] In considering this demurrer, I am convinced that the plaintiffs' rights have not been violated, and, that the drillings allowed by the commission were consonant with the plaintiffs' ownership, rights of development, and enjoyment, and preservative of the property rights of neighboring and contiguous owners.

The demurrer is sustained, and an order will be drawn accordingly.